The next case is 2018-20251, Nicole C. Wittmer v. Phillips 66 Company. I think we'll hear first from counsel for Ms. Wittmer. Good morning, Judge O'Rourke, Judge Higginbotham, Judge Ho. My name is Alfonso Conard, it's nice to see you again, and I represent the excellent Nicole Wittmer. I don't think I'm going to need all my time today unless you just have a barrage of questions for me. I'm smart enough—I'm not the smartest guy, but God helps me—to know why we're really ultimately here, and that's on the coverage question as it pertains to transgender individuals in the workplace and how that applies to Title VII. And I understand I've got colleagues here that are here to address that issue in more substance, so I will use my limited time to primarily focus on the component of making a fourth prong of a primary case pretext as it pertains to failure to hire. I'd like to utilize my time for that purpose. Again, it is worth noting, as I stand here, that the two parties of interest have not under any circumstance disagreed with Judge Rosenthal's inference that Title VII does in fact cover transgender individuals in the workplace. It was not briefed by Phillips 66. They've taken no issue with that component. I think Judge Rosenthal is one of the best judges we have in the Southern District, and I think that in her infinite wisdom, she knew that my law firm would bring this here, and that it would end up here, and the United States would take on this issue, and is probably hoping for the best. Now, that being said, I do still disagree that the fourth prong wasn't met as it pertains to the issue of... Do we have a fact question here? Do we have a fact question as to whether or not Nicole Whitmer was not in fact hired because of her transgender status? Was the job offer contingent on her clearing the background check? So, the job offer was made. It was contingent on the background check. Now, you've got to understand, we've got an individual that went through four interviews. All right? One telephonic and three in person. Now, I went back and I reread and reread and reread the filing by the FLE, and there's a lot to do about August 3rd and how that impacts this background check. I think it's important to note that any errors that would have existed on this background check would have been through this third party hiring service. All right? It wasn't Whitmer that went in and made some patent misrepresentation about when her end date was. And let's also keep in mind that she started this process in May of 2015 when she was in fact there with this previous company and continued to go through the process. But does any of that really matter? I mean, couldn't the company say, I'm not saying that she's a bad person or that she's a liar, but there's a mix-up here and we don't want to fool with it. We don't want to research this and figure it out. We're just going to move on. Why does it matter whether she did it or whether it's an employment service or whether she actually was an employee? Why does any of that matter? It matters everything, in fact, to the extent that let's first look at this in the context of problem facing. We're looking at that fourth party. Let's start there before we get to pretext. Looking at that component, there was not anyone else that was hired for this position. So if we're looking at the Willis case, you have to infer that someone else was, that there was a comparator there, that there was another non-transgender individual that was given more favorable treatment. Well, that doesn't exist here. There was not anyone else. There is no comparator that was put into that position. That's why we need to look to the progeny of Joshie and even Teamsters to look at this reason. Was this reason enough? Was this a good enough reason, this mistake by this hiring company? Now the burden has shifted. And if this is their legitimate, quote, unquote, non-discriminatory reason for not hiring her, now we've got to look at the nuts and bolts of this reason. Is this really the reason in the context of the problem facing analysis? We've got the first three problems. The fourth one would not be missing if we look at this under the Joshie standard or the Teamster standard, which looks to, OK, what actually happened? Here, no one else was hired. The position was eliminated. The record does not reflect one way or the other why that position was not filled or if it was filled at all. As opposed to someone that was non-transgender was given the position in lieu of Ms. Whitmer. That didn't happen here. And so that's where this is distinguishable in terms of looking at this pretext. Well, is that really a good enough reason? Mind you, we've got an email on September 10th that goes from Whitmer to the company directly saying, you all have realized that I'm transgender and understood as of September 2nd that they were. That comment came only afterwards in response to the decision. It strikes me as being very material when an employee is applying for work and they ask the question of whether you're still employed, whether or not he's in this state, whether they're currently employed with a prior employer. Because if they're not, if they're no longer employed by the prior employer, that immediately raises questions about why they departed. You're not an employee seeking other opportunities and so on and so forth. On its face, it strikes one as being very, very important. On its face? I don't disagree with you, Judge. But there's more to it than that. We've got to look a little further into it. Well, I agree. But my question is, what does the record show about when this employer learned that he was transgender? All right. So, on September 2nd, it's made known to her that there's potentially some issue with the background check. All right. Now, Ms. Whitmer, on September 10th, 2015, sent an email to Ellen Fulton at Billet 66. All right. Letting her know, I became aware that you all found out that I am a transsexual woman. So, we know definitively that it has been communicated by Ms. Whitmer on September 10th, 2016. What happened before that? Well, what happened before that, there was, some issue was communicated to her that, back to the background issue, right? Okay. Potentially. But now, I think this is what's important. I think we have a fast question here, Judge Higginbotham. I get it. But, the response was, and if you give me a second to read this entirely, I think it's important. It's not that long. Nicole, this email is in response to your email below, suggesting that we were aware that you were a transsexual woman, and that this was the reason we were going to rescind your offer of employment. We were unaware of your status as a transsexual woman until receiving your email. Okay. So far, so good for the employer, right? This knowledge will not influence our decision one way or the other, still. So far, so good for the employer. As you know, I have expressed concern regarding discrepancies in information you provided over the course of the hiring and pre-employment due diligence process. Everything you just said, Judge Higginbotham. I anticipate that I will notify you of your employment status by early next week at the latest. So, let's take that additive word, at face value. I anticipate that I will notify you of your employment status by early next week at the latest. So, here we are, September 10th. She hasn't been told that this was such a huge deal. She hasn't been told, look, we don't want to figure this out. There's some discrepancy. We're not getting into it. The company, we've gone in another direction. This is from the company director. This isn't even from the hiring service. They didn't shut the door. So, now we have a fat question, and in this context, all inferences need to be made in favor of my comment. Without weighing the evidence, because I think that's what we would otherwise be doing, without weighing the evidence, we now have a legitimate fat question as to why they didn't shut the door. Were they being disingenuous in saying that, oh, it was this reason? And let's not forget that there was other discrepancies that were on this report by this hiring company, this third-party hiring company, that apparently weren't that big a deal. They honed in on this one. So, without weighing the evidence and giving weight to my client, we've got a legitimate fat question here. They had plenty of opportunity. In fact, the hiring company was sending out an email telling her to report to work on September 14th. It wasn't until September 15th that the offer was formally rescinded. That in and of itself is evidence of an inference of discrimination. Look, a fat client or jury may not find that there was discrimination. So be it, but there's enough fat questions I think to be asked and answered. I have a couple of pesky procedural questions for you. Sure. Did you raise the pretext argument at the district court? And if so, where? It was, and I would like to brief that later without spending the next four minutes pinpointing exactly where we put that. And I did see the footnote where they are unsure whether or not we raised it. It's my contention today that we did raise the issue of pretext as well. And you can't say, oh, it was in this brief on summary judgment. I mean, you can't tell us? I believe it was in our response to the summary judgment. Okay. But more, but I'm here. Are you saying that you had to raise it? We understand. Okay. But Judge Rosenthal didn't even get to that. I know, but if we're looking at it, we have to look, and you want us to find that there was a fact issue on pretext. Separate and apart from all of these other types of things, we have to say, well, did you raise a fact issue on pretext in the district court? Just in a garden variety case, I mean, that's a question we have to ask. We did, and I'm happy to brief that further after we leave here. But we're looking at a fact question, specifically what Judge Rosenthal looked at on that fourth prong of promofacia. Okay. And this court in Godot, if you'll recall, found that that same analysis when you're looking at promofacia is good enough for pretext. Okay. And assuming that we did, in fact, allege pretext, then we should be in good shape. Okay. Then I have one more pesky question like that. Under Yosti's failure to hire standard, don't you have to show that after not being hired, the position remained open and that they continue to seek applications? And I thought that you said the position was closed. So help me on the law on that error problem. At some point, it was likely closed. Now, I don't know as I sit here today who got hired into that function, if anyone at all got hired into that function. Am I wrong that you have to show that the position remained open in order to raise at least a fact issue and proceed with your case? That's exactly what it says. After such rejection, the position remained open. So how long that position remained open? It may still be open today if it wasn't filled. If it wasn't filled, that position remained open. So we agree that there has to be some evidence in the record that the position remained open? Under the Yosti standard, absolutely. Now, if we look at the Teamsters, that looks at it slightly differently. If we look at Teamsters, we raise an inference of discrimination without even having to look at the Yosti standard as to whether or not the position remained open or not. But as far as we know, that position remained open. If it was never filled, it remained open. And that functionality obviously doesn't go away if it was posted and it was offered to someone to begin with. But I think we need to look at the Teamsters in that component. Now, I see that I'm almost out of time, and I would like to still lead into my colleague's presentation. We're talking about—this is so general, but justice for all, right? Justice for all except transgendered people. That's weird. Well, that's not right. Other circuits have— Is that a call for courts or for Congress? I'm sorry? Is that a call for courts or for Congress to make? That's a call for this circuit to be able to make today, that transgendered individuals are protected under Title VII. Let me give you a hypothetical employer who hires 50 percent men, 50 percent women. It's perfect. Literally identical number of men and women. But of the millions of employees, half of whom are men and half of whom are women, not a single one is transgendered. Would the typical person on the street describe that employer as sexist or transphobic? I can't speak to any average person on the street. Well, what would you call the person? I can't categorize or generalize. It's not that stringent. Are you a man or a woman? It really is how you self-identify. How you self-identify is what you are. What I'm saying is that the employer has literally hired equal numbers of individuals, half of whom self-identify as men in the traditional sense and half as women. But the employer has not hired a single transgender. The employer is specifically not wanting to hire a transgender. What I'm asking you is, would we refer to that employer as sexist or transphobic? We would refer to that employer, and I see that I'm out of time, but I'd like to answer this question. That employer cannot make any adverse employment action decision towards that individual based on the fact that they are transgendered, regardless of anything else. If an adverse employment action is taken because of some sex stereotype or how someone should look, how someone should behave, whether or not someone has a right to have transformative surgery to be able to self-identify, it doesn't matter. You can't take an adverse employment action. I see that I'm out of time. Thank you. Thank you, counsel. Mr. Nevins, I think that we have not, certainly not intentionally, we gave the EEOC the time that it requested was just five minutes. Please don't start his time yet. We gave them five minutes requested, and then you substituted in graciously for the EEOC at the last minute. But we had given the amici, the other amici, ten minutes. We certainly were not intending to slight you in any way, and we will give you ten minutes, and you can use whatever portion thereof you seek so that you have equal time to the other amici. I very much appreciate that, Your Honor, and it's especially helpful because of the way I have to structure my argument. I want to thank the court for allowing me to be here today, my first appearance before this court, and I'm very grateful for that. I represent the LGBT groups that were amici curiae, and I want to raise basically two major points here today. First, how this court should approach the coverage question, and then if it does need to reach it, how it should resolve it. But first I'd like to talk about approaching it because the media, when Judge Rosenthal's opinion came out, was excited and said there was a ruling that transgender employees were covered under Title VII. As you saw in the Phillips 66 brief, they said repeatedly that Judge Rosenthal assumed that, but of course her holding was to the contrary. It was for them, and therefore did not actually reach that issue. And of course you'll be hearing from Phillips 66 counsel shortly, and I submit to this court that if you do decide to rule in favor of Phillips 66, for any of the reasons that are offered by that, that you should not say things that are negative about coverage for transgender employees under Title VII. And the reason for that is that, as I understand it, and I'm pretty sure that this is true, that if you were to rule in favor of the employer on the other grounds that are being raised, and of course they're not raised in the coverage issue, and you were to say things that made me very happy about Title VII's coverage, that that would constitute dicta, and it would be this court's three learned jurors' thoughts about the coverage question, but it actually wouldn't be a binding holding. Actually, in our courts, we make alternative holdings, and they can be both binding. So I can imagine a scenario, and I'm certainly not foreshadowing who would win or not, but the fact that you're ultimate holding doesn't mean you don't make holdings along the way, assuming arguendo that, this and that and the other. And you would know your courts. I was confronted with this in the Evans case, because the court's negative statement about coverage of sexual orientation discrimination was in line with the final holding of the court in Bloom, that it constitutes an alternative holding. But I've also encountered several cases where the statements that led to a different result, or that led to a different thing, as Phillips 66 said, that it's considered an assumption but not an actual holding. So if that is the case, then I certainly would ask the court to… It doesn't have to be written that way. I'm not foreshadowing any particular, but we have precedent that says that. And to that point specifically, Your Honor, what I'd like to say is that when it comes to, on the point of judicial restraint, when it comes to talking about that, this court certainly walks the walk on it. And Phillips 66, on page 23 of their brief, talked about instances where the court ruled on other issues and specifically said that they weren't going to reach certain things that were covered. I'd like to say, repeatedly and recently, in both published and unpublished decisions, this court has, when it comes to Title VII's coverage of anti-LGBT discrimination, has noted that the issue was fiercely contested by the parties, but because it ruled for the employer on other grounds, it was not going to make a pronouncement about Title VII's coverage. Are you asking us to do that here today? I beg your pardon? Are you asking us to do that here, not that the Fifth Circuit does not need to make it? What I'm asking you is, what I'm saying is that if you ruled for Phillips 66 on any of the non-coverage grounds, if you uphold the judgment on any of the bases supported by the record, as Phillips 66 is, then I would say that this court should not reach the Title VII coverage issue as it didn't in the Brandon v. Sage case, as it didn't in the Stewart v. Brownsville case, as it didn't in the Rodriguez v. Brownsville Independent School District case just last summer. So you're not asking us to reach it and say that this is an important area that we should have an opinion in, just as other circuits do? That's not the position you're taking here. I believe this court should wait for a – I certainly believe that if I'm facing a heads-we-lose, tails-we-really-don't-win situation, which I came in assuming this, I absolutely am asking that for this court. If Your Honor is telling me that if you say Title VII does cover transgender – does cover discrimination against transgender workers, and if you say that but still ruled for Phillips 66 on another ground, that that is a binding holding, well then that's not what I understood coming into this. I would still think that this court would want to wait for a case in which it mattered. Well, it is kind of interesting, though, that we have perhaps – and no offense to other lawyers in the world, but we do have lawyers who are particularly adept at arguing these issues who have briefed them in other cases around the country. Would you agree with that? And so to rule when it's keyed up – I'm not saying we have to, but we have done the work to do it if we were so inclined. Correct? Well, first of all, I certainly appreciate your saying that. And I know Mr. Mortera filed a very strong brief here, and I'd like – and I should probably pivot to actually addressing some of the things that were raised there. Because even though he did an admirable job of not engaging in the simplistic and incorrect way of arguing its coverage that so many other lawyers and courts have engaged in, which is to say, well, you asked Congress later on to add this protection and they didn't do it. Now that's been recognized as a discredited way of statutory interpretation, and he dutifully tackled with the actual statute that Congress did pass instead of what it didn't pass later. But let me point out a few what I believe to be analytically legal flaws. First off, the idea that nobody would treat a convert worse than a longtime adherent. He basically – there was a dispersion cast on the notion that the discrimination against a convert was discrimination on the basis of religion. First off, you don't have to be against converts. You don't have to have a bias or an animus towards them. You only have to treat them worse. And there is definitely – there are definitely cases in which that has happened. Indeed, the U.S. Supreme Court actually ruled in 1988. And first off, I should say some of these things, because I'm – this is his brief that filed less than two weeks ago. Some of these cases are not before the court, and I would be – I would welcome the opportunity to present a supplemental statement that Mr. Mortera could respond to. If the court were so inclined, I think I'm inclined to make a – to move the court for that. And then if the court decides that it wants to address the issue and accept the statement and give Mr. Mortera a chance to reply, I think that would be fair. Some of these things, you know, literally, we got the brief right after Christmas. We got the – I'll call your request, and the court will make a determination when it reviews the request. Okay, very good, very good. And so – but along that line, if you – the Hobby v. Unemployment Appeals Commission of Florida, 480 U.S. 136, 1987. The court said, in effect, the appeals commission asked us to single out the religious convert for different, less favorable treatment than given an individual whose adherence to his or her faith precedes employment. We declined to do so. So – and there was another case called Heller v. EBB Auto Company that said, because we find that EBB failed to initiate any effort to reasonably accommodate Heller's religious practice of attending the ceremony in which his wife and children were converted to Judaism, we reversed the judgment for the employer. So there have been times in which religious converts were treated worse, and that's the inquiry under Title VII. You don't have to have bias against the – you don't have to be anti-converts. You only have to treat them worse. And if you – if an employee – if an employer could say, well, we didn't know you were – we wouldn't have – we don't have anything against this, but you surprised – that was what happened in the unemployment appeals case. You surprised us. You've got two minutes. You've got two minutes. If I may ask you to address the question I proposed earlier, the hypothetical employer who hired 50-50. Your Honor, I would – I think the answer to your question is what you think it is, which is that they would be transphobic. But what I would submit to you is that they also – We would describe that person – we would describe that employer as sexist or as transphobic. As transphobic, but that doesn't mean that they didn't violate Title VII. And what I would say to you is that Martin Marietta, back in 1971, had one of the best track records for hiring women of any large employer in the company, but they said that women who had small children couldn't keep their job and men who had small children could keep them. And so most people would not have considered Martin Marietta to be a sexist employer back in the 70s, but that all you need to do is have – What you just described is literally sexist. It is. So absolutely, it is, but most – And you're acknowledging that under my hypothetical. August's hypothetical was a generally good employer, and you could be – Let me stipulate further to my hypothetical. There is no such policy along the lines of what you're saying. Every single woman would agree we're treated exactly the same way as every single man. So I think we're in agreement, though, that we would describe that employer as transphobic and not as sexist, stipulating to my facts. But I still think the question is whether you are engaging in differential treatment. Fair enough. Also, when it comes to another point that was raised, the Catch-22 point. The Catch-22 point suggests that it's not a problem under Title VII unless the trait that is prompting discrimination is something that's favored in the other gender. This Court's in-bank decision in EEOC v. Bow Brothers removes that argument from the – Given your limited time, if I may, can I ask you to address the bathroom hypothetical? Under your theory, Title VII forbids employers from even thinking about a person's sex, not just sex discrimination but any consideration of sex. Would that also be true of a bathroom policy? And, Your Honor, what I would say in response to that is that what we don't know – the Supreme Court has never blessed, outside the bona fide occupational qualification, any of these differential treatment on the basis of gender. What Mr. Wortero suggested is that there are instances in which they would, and certainly this Court and others have blessed certain kinds of things. I think one thing to look at – I guess I'm asking for a yes or no answer, given your – Let me ask the question. Let me ask the question. An employer fires a man because – at least a biological male – fires the person because they decide they want to use the female bathroom and the employer has a policy, both with respect to their employees and customers, we want only the – what you might call the traditional approach to bathrooms. Employer decides to fire that person. Is that a Title VII violation? After all, a woman would not have been fired for using a woman's bathroom. And I believe it is for the reasons that the EEOC set forth. It is a Title VII violation. But I would submit to you in this case that you don't necessarily have to reach that because that wasn't necessarily – the evidence is not before the Court that that was the basis of the decision here. It's a hypothetical. Right? It's a hypothetical question. It's a hypothetical question, yes, Your Honor. And if I could, I would also say that the original public meaning of – if you want to – I think the best way to look at that is to look at this Court's decision in Deffenbach because what the Court said there is, of course, the original public meaning of race did not include discrimination on the basis of interracial relationships, but the question is whether or not – and it specifically agreed with the employer that no, of course, the statute's words – the statute – it says the word – Well, we have a question about that. Yes, go ahead. You're saying that it doesn't matter that the word – the original public meaning meant something different. Isn't that what you're saying? No, I'm sorry, Your Honor. What I'm saying is that if you just take – if you take the word – I mean, we're not arguing for a broader definition of sex than man or woman. What we're saying is that you can discriminate on the basis of sex because you discriminate against a transgender individual the same way that you – race doesn't mean a person of one race married to another one, but you are discriminating on the basis of race if you engage in that, and that's what the Court decided in the Deffenbach Williams. Okay, so does that mean that you don't – I'm troubled about the Federal Hate Crimes Act and the Violence Against Women Act, VAWA, and several other funding provisions of federal law uses – adds the term gender identity, whereas Title VII doesn't. Tell me why that doesn't matter. Because I think the most important time if you're going to – first off, I don't think looking at subsequent inaction by Congress is a good way of doing things. I mean, I don't think there's an obligation for Congress to update all the laws just because they chose to use better terminology in a later statute. The question is still what the 1964 statute covers. And I would submit to you that in 1990, right after Pricewaterhouse, the Americans with Disabilities Act was passed, and Congress put in a specific exclusion for coverage against sexual orientation discrimination and gender identity discrimination. They said that will not be covered in the Americans with Disabilities Act of 1990. Turned around in 1991, and they didn't touch Pricewaterhouse's sexual stereotyping holding, but they did actually change the standard for liability under Title VII in a way that's favorable to miswitness claims, because it said if sex, race, color, national origin, or religion is a motivating factor in the decision, then there's a Title VII violation. Obviously, as you know, the remedies are lower. You don't get all the same remedies. But a Title VII violation only requires that sex be a factor, a motivating factor. It doesn't require that there be discrimination because of such individual sex. Okay. I think Judge Ho has one more question, and then you can give a one or two-sentence wrap-up, and then we're done. Okay. Thank you. Thank you. You mentioned marriage earlier, and I'm curious, what do you make of the fact that a very similar argument was made in Obergefell, this notion that traditional marriage laws are, by definition, sex conscious, right? Only a man can marry a woman, a woman can't marry a woman. Not a single justice in Obergefell accepted the argument. In other words, they treated marriage, the majority treated marriage as sexual orientation discrimination, but nobody treated it as sex discrimination. Other judges have entertained that argument, but not a single justice did. What do you make of that? Well, first off, if the decision had come down the other way and thereby implicitly rejecting all the arguments that were being made in favor, then I would be in very difficult straits right now. I mean, even though there are differences in constitutional versus sexual orientation. But I think your Honor's point, I think what happened in Obergefell is it was a decision to be made that was, first off, it was going to be under the Due Process Clause talking about the right to marry, and then coupled with that, you know, there was some equal protection. There was an equal protection to prudence, but primarily it was a decision that there was a fundamental right to marry existed, and it wasn't something that was based on the person who was actually, the gender of the person who was doing it, that this right to marry existed. So I think the decision to resolve it on another ground doesn't do anything to harm my position. That's fair enough. We don't want to overreach Supreme Court silence, but you have Judge Berzon, Judge Walker, you have the parties themselves devoting an entire section of their brief to this sex discrimination argument. It would have been, finally, easier. You get intermediate scrutiny under sex discrimination, and yet not a single justice took that easy opportunity. And I think based on, if you look at the arc of, you know, Justice Kennedy's jurisprudence, especially if you look at Lawrence v. Texas where the equal protection alternative is there, and the decision to go for the fundamental right, for the due process right, I think there's a trend there that it's just a desire to rule on that basis rather than the sex discrimination basis. And so, in closing, I would just say that I do, I would like to have the opportunity to explore some of the, what I believe are some of the misconceptions about Title VII law generally that are in the Court of Appointment AP briefs, and we'll submit a motion along that line to break those in more detail later, and then the Court can deal with the bill with that motion. Thank you. Thank you. Appreciate your service. May it please the Court, counsel has accurately represented that Bill 66 is not taking a position on whether transgender persons are protected by Title VII. As we said in our statement of oral arguments, and we stated in the body of our argument session, we agree with Judge Rosenfeld that the proper way to approach this particular case is to assume that they are protected, and that because there are other bases consistently familiar to non-controversial law on which to grant some re-judgment in Phillips 66 favor, that's the better way to go. Does that mean that in a future case, I know you contest liability here on other grounds, but in a future case where you don't have any other theories, Phillips 66 plans to stipulate the liability? Your Honor, I'm just curious. I saw 66's form of policy, which is at 189 of the record. Excuse me, I saw 66's form of policy not to discriminate against persons who have a transgender identity. So, in this particular case, there was really no reason to make the argument because there was no indication that when Ms. Whitman presented, either during her initial phone interview or after several hours in her interview, that she was a person who was assessed for transgender status. So, she was not charged by Phillips in any way in this case because of transgender status. It's a non-issue from our point of view in this case, and consistent with our employment policy, it is my understanding that it would not be the basis for an employment decision by Phillips 66 in the future. Does that answer your question? I think so. So, if those accounts are correct, then, you're not just not making the argument. You're affirmatively stipulating. I don't think I need to stipulate. You don't need to. I'm just asking. I'm just asking the court to affirm Judge Latham's official court opinion based on those other two grounds. Okay, what if you were to lose on those grounds? Your Honor. I'm just assuming arguendo. You lose on those, so you're going to go back to trial court and try whether or not there's pretext. And so, you're not ever going to argue that it doesn't apply. Correct. So, if the court were to rule against us, which we of course hope that it doesn't, but let's say the court were to find that there was a fact issue on pretext, we would not go and take this case up to the U.S. Supreme Court on a protection of coverage issue. We would then go back to the trial court, the district court, and we would literally refer it to whether there was sufficient evidence of pretext. That's exactly right. So, again, that confirms that the transgender issue is not an issue of concern for Phyllis in this case. We ask that the district court's judgment be affirmed. Right. And so, if you lost at trial, you wouldn't argue on appeal. So, you foreclosed your ability to argue that at any point, even if it's not a stipulation. I don't think I've done anything yet to foreclose it. I'm just saying we're not arguing it today, and we're not asking for the court to rule on that basis. We are agnostic in this case to that issue. Can we send it back without ruling on that issue? Can you send it? I'm not sure if you were – I think you can send it back. In all the cases that were addressed by Mr. Levin today, in those cases, the court did affirm on other basis. We can send it back on the basis of the fact issue, and then Judge Rosenthal can decide what she wants to do with it. She can decide to rule on it or not. But if she doesn't rule on it, then we're – it seems to me that we don't have the case before us. I hear your argument to say that your company wants to win this lawsuit, but you want to stay true to this issue. I said, I think you – I understand your point. You don't know a dog in this hunt. That's what it boils down to, and I appreciate that. We can affirm without addressing the coverage issue, but we can't reverse and remand without addressing the coverage issue, can we? Very clear. If I could now move to the discussion of what I think – We're going to follow up on that. Sure. If the court determines that Judge Rosenthal hasn't decided the question, then what she did base it on was a fact question, and we sent it back to her, and we're back to ground zero, and the argument can be presented to her there. You can make the argument or not. But it's open. That would be my understanding of what would happen. You could send it back down to Judge Rosenthal and direct Judge Rosenthal to rule on the threshold legal issue of whether the statute affords protection for transgender persons. I will tell you that we will not be making the argument in front of her. Well, we wouldn't be sending it back to her if we find that – unless we – if we find it a fact issue, then we send it back to her. And you're saying in addition to that, we ought to try to also address the other issue. I'm not suggesting that you do suggest that she rule on it. I'm saying that you potentially could direct her to rule on a threshold legal issue. We're not asking you to do that. We're asking if you were to rule on the case, that it would just be on the fact issues that you had. I'm just trying to get it clear. I don't – this is an issue. It's a widely debated issue and a very important case. And until we get that case court-represented, we ought not decide it. That's my basic – that's an old, basic conservative principle that used to be in place called constitutional avoidance and judicial restraining. But I don't want to be real clear about the company. I think I understand what the company's position is. You're not fighting that social issue. And I think the question put to you is, well, would you – if it came down to – if you had to decide it and take a position, then you would. But until you do, you don't. Correct, Your Honor. And, yes, I agree about you. Justice Scalia said long ago that the courts would decide issues where there's an issue between the parties. And as to these parties, we're not fighting that issue. But the other side of the coin is that we – when the issue is represented, we have to decide it. I think Don Marshall made that pretty clear, and we still invoke it for whatever work it may have. Yes, Your Honor. Counsel, can you help us? Did opposing counsel raise pretexts in the district court or not? Your Honor, there were some arguments that were – pretext arguments that were sort of made in connection with the fourth time. I think the waiver that you're speaking of is on the motivating factor. So we have pointed out in our application that although in the complaint and in his response to some of the judgment, there was mention of a motivating factor, there was never any argument in support that the reason that Phillips 66 decided to resume offerable employment was because of a discriminatory intent. Okay. Is it true that there is at least a fact issue that Phillips 66 did know of this situation before it made its ultimate employment decision? No. Unquivocally, no. Well, can you explain the timeline that was presented by opposing counsel in some detail from his phone? Okay. And I'd like to also preface by saying that with all due respect, I think counsel has conflated the fourth time with pretext. So I want to just focus on the pretext issue right now, which does go to the timeline. So what we had was there was a phone interview on July 10th, and then that went very well, and then Ms. Whitmer called in for an in-person interview on August 1st. Now, what Phillips 66 did not know when they called Ms. Whitmer in for that interview was that Ms. Whitmer had received a letter of confirmation from her prior employer dated July 28th that said unambiguously that her employment ended on July 28th, that it was effective on July 28th. She has an all-day interview with Phillips on August 1st. She represents that she is a current employee of the previous employer's company called AdRam. And her interview goes very well. And a few days later, Phillips extends an offer of employment to Ms. Whitmer, conditional on-employment background check, being clear. On August 1st, on September 2nd, Ms. Fulton at Phillips, she's in human resources, and she's one of the people who actually participated in the interview with Ms. Whitmer, gets a call from the outside vendor, it is a discrepancy about the prior employment. And that discrepancy is very important to Phillips because the discrepancy shows that when Ms. Whitmer had her in-person interview, she was no longer employed, that her employment had ended but a few days earlier. And so Ms. Fulton picks up the phone and calls Ms. Whitmer and says, we've got this information, please explain what's going on here. Ms. Whitmer then comes clean and says, yeah, I did get this letter, and I didn't think it was a big deal, but I'll go ahead and send you the letter. And now Phillips has in its possession the July 28th letter terminating Ms. Whitmer as of July 28th. And then there's discussion internal at Phillips. What are we going to do about this? On September 8th, Ms. Fulton called her colleagues who were participating in the interview and were part of the decision-making process. She called Mr. Long and she called Mr. Korsky. And on September 8th, the three of them determined that they are going to rescind Ms. Whitmer's conditional offer of employment. That happened on September 8th, the decision was made. On September 8th, they had no inkling that Ms. Whitmer was a transgender woman. Again, they interviewed her for a full day. There were no questions about her mannerisms, her appearance, her motive to speak, her behavior. And this is in the three declarations that are on file for support. They had no idea. They make a decision based only on the fact that Ms. Whitmer did not foresight about her employment status. Right, but did they reopen the decision? Because they sent that ambiguous note that says, we will not consider that, but then said, we will let you know one way or the other. I mean, they're not saying what the decision is. Are they open at that point or they already made the decision, they just don't want to let her know? Your Honor, there is nothing in the record that indicates that they reopened the decision, and they did not reopen the decision. So it was just an... They just didn't tell her at that point. They didn't tell her, so it was, we'll let you know our decision, but they were not actually reconsidering her at that point. There was no reconsideration. The decision was made on September 8th. On September 8th, there's data, there's information available to those who think that Ms. Whitmer had not been foresight. Does the letter create any, the response note, does it create any kind of ambiguity on that point? We do not think so, Your Honor. We think that the letter that then went to the conversation that was having with her when she was told on the 14th that she qualified in on the 15th, and the letter on the 15th, all unambiguously provides that the reason why she was terminated. There's nothing, and again, this only judgment was based on evidence. This is not a dismissal on the paper. Ms. Whitmer had all the opportunities that she wanted to discover facts that would support a claim of pretext, and she did not discover any facts. A decision was made on September 8th that was not revisited, that was communicated to her after her email identifying herself as transsexual was received by her. But there's nothing, there's no reposition has been, there's absolutely no paper, any evidence whatsoever, that proves that any time we can prove this decision. The decision was made on her failure to be forthcoming about her employment status and employment. And there's nothing at all in the record that says, oh my goodness, she's now told us this, and we better watch it because we have to make sure we don't run afoul of any rules or our company policy, and so we might need to re-look at this and make sure that this is the right, you know, you understand. If you deal in employment law, you know what I mean. You're exactly right, Your Honor, and the Feminist Council has the opportunity to ask witnesses these questions, and they're fine when we look at that position testimony, but in the record, there's nothing of that sort. There was no reopening. There was no investigation. They made their decision. They felt very comfortable with their decision. And again, as you know from reading the statement, Phyllis doesn't have to be right or wrong. She just has to have the religion to say that this was a proper reason to decide to extend employment. But is it a proper decision? I mean, it strikes me as kind of a weird one. I mean, the discrepancy, as I understand it, is Whitmer was employed with Agrium through August 3rd. As it turns out, it's August 2nd. Your Honor, there is sort of a— It's not a big discrepancy. It's not the biggest fraud we've ever heard from an employee. It's not what we're talking about in one day. If she's agreed with us on the 4th and told us that she can terminate on the 3rd and it actually happens to be the 2nd, you're exactly right. But she came in and she told us that she was currently doing work for Agrium. That the reason she was job hunting was because Agrium wanted her to consider spending more time in Canada or possibly moving to Canada. She was completely disingenuous with those specifics about the reason that she was looking for unemployment. So this is not just, oh, I made a mistake about a date. This is, I'm sitting here and I'm talking to five individuals and I'm telling them what I'm doing for my current employment. That's a big leap from all I know about the date. Does that answer your question, Your Honor? Yes, ma'am. I want to also talk about the 4th crime because there's an issue on what is the correct formulation of the 4th crime. And this is a disparate treatment case, so as you know, you have to show it to each other. And that's what the plaintiffs agreed to below. They cited all the termination cases and then they said, well, now we're sending them to court. Those are the wrong cases. We should look at the failure to hire cases. And Judge Rosenthal has been acknowledging the courtroom today as one of the finest jurors we have, and she actually did cite, as Phyllis has cited below, and some of us are familiar with this, the failure to hire cases. And under the failure to hire cases recently submitted for the Rodgers case in 2016, the court has used the comparative formula. But even if we're going to use the Joshua formula, plaintiff still does not belong to that formula because what the plaintiff needs to show is either that the employer fills the position of the person outside the plaintiff's protected file. Well, this position was never filled, so plaintiff did not belong on that file. Or the plaintiff has to show that the employer kept the job open and continues to interview applicants that were outside the plaintiff's protected file. The summary judgment evidence conclusively shows, with no controversy evidence, that Mr. Long, who was the person charged by Phyllis in this position, did not ever interview anybody outside the plaintiff's position. So he says that on page 233 of the record, there were zero public office claims that were considered. So even if we were to excuse the waiver by plaintiff's parole for arguments arguing the wrong cases, then a lot of the reports we now look at, this new formulation, they still have failed to come forward with a primary case case on the fourth term. Meaning he doesn't even have to get to pretext. So there are two bases on which the court can find the summary judgment. Failure to raise the exact issue on the fourth term of the primary case case or that the plaintiff did not come forward with the pretextual evidence that would negate a legitimate, non-discriminatory reason for deciding to withdraw our conditional counsel evidence. I have a couple more minutes, but I'm happy to give the court back some time unless you have any other questions. I think we have your argument. Thank you, counsel. Thank you very much. Thank you, Your Honor. I'm really pleased to report Adam Mortara by the court's appointment. It's a very great honor to be back here in this court for the first time in 18 years, perhaps to offer some help perhaps for the first time. Your Honor, I want to begin with the bathroom. I didn't wrestle with it while I was sitting there. Should I begin with the bathrooms? But we heard something rather astonishing and interesting. I've been chasing my friend around the country trying to get an answer on the question of bathrooms, and I finally got one. Sex-segregated bathroom policies are unenforceable under Title VII, according to my friend. Well, that would be a very great surprise to the public when the 64 Civil Rights Act was passed. And at the risk of teaching the greatest civil rights court that this country has ever seen about the history of the Civil Rights Act, I understand it to be the case that after the 64 Act was passed, the signs for race-segregated restrooms in employers around the country, particularly here in the Fifth Circuit, went down. Employers understood that race-segregated restrooms couldn't all understand. I am not aware of any history after the Civil Rights Act was passed of anyone saying that sex-segregated restrooms and sex-segregated restroom policies were illegal. In fact, OSHA today requires sex-segregated restroom facilities at employers across the country. In order to get to where my friend wants you to go, you have to not just surprise or shock anyone who was around at the time that the 64 Civil Rights Act was passed or understood its original public meaning, you have to create what is in effect a new sexual revolution in the workplace. And that is nothing that this court has the responsibility, obligation, duty, or even power to do. Title VII does not cover transgender persons. But I think, and going back to the discussion a little bit about the district court hearing Judge Rosenthal, I think we do have to start with Bloom. And I didn't get a chance to hear exactly how it is this case differs from this court's holding, one sentence though it is, in 1979 in the Bloom case about sexual orientation. No human being, no judge, no lawyer has ever distinguished the issue of Title VII's coverage of transgender persons from Title VII's coverage of sexual orientation. No one has done it. In fact, every court sort of runs through Garda-Hydeway and gets right to the issue of transgender protection, and yet Judge Rosenthal did not cite or discuss Bloom. And I have to tell you, I had a footnote in my brief where I tried to explain this, and I think the best explanation, which I'll give you right here, because I took out the footnote, is that no one told her about Bloom. No one mentioned it. And allowed the district court, the parties here allowed the district court to ride right through Garda-Hydeway, which are directly contrary to this court's still-binding holding in Bloom. The 11th Circuit has said, still binds it. And I'm not aware of any distinction in the analysis now between the bathrooms, grooming policies, and this court has an en banc decision about grooming policies under Title VII from 1975, which is the Willingham v. Macon telegraph case. Of course, Bloom wouldn't really, really inform Judge Rosenthal's ruling on the Fourth Prong, would it? It would not. And that kind of leads exactly to the point I think, Judge Higginbotham, you might have been making, which is, did Judge Rosenthal really decide this? But I'm not Judge Rosenthal, and I'm not in the court, and I don't know. I didn't get a chance. I couldn't find it. I didn't look at the briefs that were filed and whether Philip 66 cited Bloom or not. I don't really know what happened. She's a careful writer, and she said assuming. There is that. There absolutely is that. To be clear, you're saying that probably nobody cited Bloom. That's my understanding. But Zarda cited Bloom in the introduction of Zarda. Yes, absolutely. She cited Zarda. I mean, Zarda and Heisley, which are directly contrary to this court's decision in Bloom, which is why I'm somewhat curious that Bloom goes unmentioned by the district court. Of course, it went almost completely unmentioned here until Your Honor decided that I should get involved, and I've been looking at this. Well, Mr. Torey, we would like to get your expertise on the insistence with regard to the issue itself. Put aside Bloom for the moment and go directly to the question of Title VII's reach. Oh, so putting it that way. Yes. The argument in favor of the coverage question that my friend is making is effectively that the Butford test universally describes the statutory scope of Title VII. Judge Sykes capably dismantled that argument in the Heisley dissent, and I won't repeat the arguments there. Judge Lynch really, in his Zarda dissent, really capably dismantled the alleged correspondence between race and sex discrimination, and I won't repeat those arguments. My primary argument against this application of the Butford test in an interpretive fashion really was the parade of absurdities that now have just admitted are all illegal. Every single grooming policy that distinguishes two sexes is illegal. Sex-segregated bathrooms are illegal, and so on and so forth. And I'll take the parade of absurdities one step further, Judge Judenbach. Every single court that's confronted this issue under Title VII has turned around and done the same thing under Title IX. So now we are talking about high schools and elementary schools and bathrooms and changing rooms, and that is where this is all headed. And at the point where you can judge an argument by the company it keeps, this Butford test is doing way too much more work. And I have one hypothetical—oh, go ahead. Well, you know, you cite us to what you perceive and others perceive to be eloquent, but they're dissents. You're not winning this—not you personally, but this argument is not winning in the other circuits. If it's so clear and so absurd on the other side, why is it not winning? You know, it's interesting. You're saying that and I'm thinking, I am winning. I'm winning with Judge Sykes. Although I wasn't there to argue that one. I didn't mean you personally. You understand. I totally get what you're saying. What I said is, Judge Sykes is right, Judge Lynch is right, Chief Judge Katzmann is wrong. Don't repeat his mistakes. And just that simple. Don't repeat the mistakes that are being made in the Seventh and Second Circuits. Those are erroneous— So we would create a circuit split, though, or not? Absolutely. If you hold that transgender persons are covered by Title VII, you create a black-and-white circuit split with the Sixth Circuit in the Harris case. And I commend to you, Your Honor, Solicitor General Francisco's brief in opposition to cert in the Harris case. If you want to do more reading about why I'm right here in front of you, it's an excellent, excellent brief. I don't cite it as authority in the 28J letter, but you can look it up. But you create a black-and-white split with the Sixth Circuit. You create, on the transgender issue, effectively a split with the Seventh Circuit and the Whitaker Title IX decisions, but no one really distinguishes Title IX and Title VII. Does the split already exist? In the city case. Yes, there's definitely an equity case in the Tenth Circuit that would be on your side if you're going my way. So the split already exists? Absolutely. Right, so we would not be creating a split, then? No, not creating it yourself. Joining the existing split. We always have to be, you know, know, are we creating a split, because there's certain procedures we have to follow, and we have to, there's court rules about creating splits. There's already a split. Bloom, we were early to the split on that issue. Unless somebody somewhere comes up with a yet-unheard-of distinction between Zarda, Heisley, and this case, which, of course, gets right back to the real ordeal of this question that the court has sort of got to put aside for a second. So as a final plan, I think we haven't heard much about sex stereotyping. I think I'm prepared to stand on my brief there. Price Waterhouse said you have to ask the employer hypothetically, ask the employer why did you do this, and the truthful response has to include one of the protected factors that the employer has given it. That's what Price Waterhouse said. In Judge Koh's hypothetical, the truthful response would be transphobia, or some version of that statement. If you do the same thing in Heisley and Zarda, the truthful response is a moral opposition to homosexuality. Those are not sexist principles. They are, in fact, sex-neutral principles, and that's why sex stereotyping cannot get my friend where he needs to go. I'll close out on the issue of Congress. I haven't read these cases. So Bowe Brothers did not go there. Oh, Bowe Brothers. In fact, it says that it was not dealing with these issues. It was dealing with sex stereotyping as evidence of sex discrimination. Is that correct? Which it absolutely is. Bowe Brothers affirms the jury verdict with some facts that as I was sitting there thinking about mentioning Bowe Brothers, I wouldn't even repeat the facts of Bowe Brothers in this court at this time. They are definitely sex discrimination. There's no question about it when you look at Bowe Brothers, and it affirms a jury verdict to the same. Whether Bowe Brothers would affirm the jury verdict on the opposite side, I don't know on those facts. But just briefly on the issue of Congress, I haven't read these cases, as I've said. I virtually guarantee you that like many of the race cases, what underlays these cases talking about religious converts is some hostility or opposition, dissatisfaction or animus towards the converted from religion or the converted to religion. And like all the interracial marriage cases, which are all absolutely at their bottom about white supremacy, these kinds of cases are all going to be about not somebody who, almost as if they're from another planet, says I just really don't like people who change religions, as opposed to I don't like people who change away from my religion to go to a different one, or I don't like people who go to religions I don't like, all of which would be actionable religious discrimination. The Sasquatch legend in my brief is all about this person that I've never encountered who just really doesn't like inconstancy in religious viewpoints. And that, I don't think, is coming up in any of these cases. But I'll be happy to address them should the court require my services further. If an employer says, I'm not hiring transgender females, but transgender males I'm totally fine with hiring them, that would be a Title VII violation. Absolutely would be a violation of Title VII. And I have to say the facts of Glenn, the facts of the Schroer case from the BBC, those look like actionable sex discrimination. Transgender persons are protected under Title VII from sex discrimination. It is my sort of common sense belief that there probably is significant discrimination against transgender women as biological men because of their sex out there in the world, and it's the job of juries to separate the lawful motive from the unlawful motive. So everybody's protected. The question is against what? Thank you. Thank you. Thank you for your service. Thank you. Can you address Bloom? I'm not here to necessarily do that. I think the parties in the interest have agreed that Judge Rosenthal got it right when she inferred that transgender status is covered under Title VII. So I prefer to get into this and use my time and nuts and bolts. Well, I think what Judge Alwine's asking is not a substantive point, it just was Bloom mentioning that as a matter of attorney-counter. Well, I believe it was. You know, I think, more importantly, a counsel came up here and said that the story stops with transgender man versus transgender woman, that if one is favored over the other, that it would absolutely be sex discrimination. That was stated here in open court. But that didn't have the equation. So now if we compare transgender man versus transgender woman, or alternatively, transgender man versus non-transgender man, or transgender woman versus non-transgender woman, that's still sex discrimination. If we're looking at gender at any point, it's still sex discrimination. So to refer to some Sasquatch legend, however it was portrayed, I think it's disingenuous at best. I just have an issue, though. I'm trying to treat the cases the way we treat all the cases. And if we have a precedent that says that holds something, that holds that sexual orientation discrimination is not covered by Title VII, and it's an old case, but it holds that. So unless there's been an intervening Supreme Court decision or the statute has changed in that regard, then we have to follow that. And it would bind us to the extent that sexual orientation discrimination is not substantively different in some way that no one is arguing here today than transsexual discrimination against transgender people. I'm not following. I said that wrong. I mean no disrespect to anyone, and I'm trying to call everybody. Do you see what I'm saying? As a matter of a judge's point, what we have to do with our precedent, we have to put things in categories. I'm not a physiology expert or a biology expert, but sexual preference is distinct from gender identification. To quote Aerosmith, if a dude looks like a lady, you can't hold that against this individual. Let's look at the popular culture of Caitlyn Jenner. But the answer is, isn't the question why it is that the employer is making the decision? Let me give you a hypothetical. The employer refuses to hire an evangelical conservative. Is that person protected? Don't we have to ask, is the employer focused on the evangelical or on the conservative? Because it would seem to me that the former is covered, the latter is not. Again, there's got to be a reason. It doesn't have to be the reason. When we're looking at Title VII, unless we're looking at an retaliation claim. I'm not talking about mixed motive. If you have a case where the employer is focused on politics, is that covered as opposed to focused on religion, which is expressly covered? If it's focused on religion. I don't want to hire conservatives. Well, if it's focused on conservatives, I still think you have a fact question as to whether or not was it really. . . How is political philosophy covered by Title VII? Or if it was really because this individual was evangelical. Political philosophy, now we're bringing church and state into one. So the question you ask at trial is not, are you focused on political philosophy? You ask, were you focused on religion? I think Mr. Mortar's position is, you ask, are you focused on sex as opposed to transgender sex? We're looking at what Judge Edwards said. Homosexuality is, at its core, a sexual preference. Self-identification is a gender identification issue, which would be distinct. This Court could, if it . . . Again, the parties in interest are not debating whether or not this is an issue beyond what Judge Rosenthal has already put in her order. Well, I think maybe you should stick to what you're doing. I think your amici might not say it's a preference and that. So, you know, I'm not . . . And I don't think the Court's going to rule on that issue. And I'm not expressing an opinion. I want you to get to what you want to say now. Can I ask for a little additional time just to address the point of . . . Go ahead and just address what you need to address. All right. So, first, to answer your question, Judge, a pretext was raised in a similar judgment on page 12 and also in this brief submitted to this Court on page 16. I think the path of least resistance, quite frankly, is to bring this back to the core of the fact issue. In fact, the interesting thing would be here, it's a procedural issue, not necessarily a coverage issue.  And Title IX that instructs the recipients in higher education and athletic programs to not discriminate on the basis of sex. Could Coach Saban not ask the question? I don't know what Coach Saban would do. I think he's not in a good mood to ask him anything right now. I wouldn't ask him yet. But I couldn't speak to that, Judge. All I can speak to here today is that this individual was qualified. She was, in fact, hired. Well, you're speaking to a lot more than that. You're speaking to the reach and not the question of the applicability of the reach of Title VII. And I'm just putting the question to you with regard to it's not so simply confined. It may not be. But if the parties of interest, if we take true, and then it's simply going back on the function of whether or not we met the fourth prong. Sometimes consequences and breadth inform the original purpose. I'm sorry, Judge, I didn't get that last question. I'm out of time. Doc, you are. I will go back to you. Did you want to talk? Did you have anything else to say about the pretext or the fourth prong? I do. Okay. I do. And so I'll go right back into it. We would still prevail on the notion because the position remained open, and there is, in fact, a question as to what happened beyond that. But under the Teamsters standard, we absolutely prevailed. That simply is whether or not someone was qualified. He or she was qualified because she was ultimately hired. And elimination of any other reasons for refusal to hire is sufficient for our purposes, absent other explanations to create an inference that the decision was a discriminatory one. I'm talking Teamsters here. So we don't even really need Josie. We're just fine with Teamsters. That would allow this court to send us back based on that question. Now, pretext was raised. Going back to the post-date, we're looking at a difference between August 2nd and August 3rd. Counsel inferred that they were very upset and very concerned that she was misrepresent, that she was working somewhere and she wasn't working there anymore. Mind you, it's important, key important, that she started interviewing with P66 in May of 2015. She started the interview process when she was, in fact, gainfully employed at ABRAM. ABRAM, in fact, made a correction to HireRite and said, Hey folks, you know, ABRAM themselves competed that her last year of employment was August 3rd. This didn't come from Whitman. This didn't come from HireRite. It came directly from ABRAM. The entity that they're saying she left for whatever reason, for reasons that weren't communicated properly to Code 66. Now, obviously, maybe she didn't want to go to Canada. She didn't like the fact that they had universal health care there. She didn't want to go to Canada. But that's not in the record at all, except from her saying that. I've got a copy. Okay. We're going to… Okay. We'll work with her. Is that in the record, except from her saying that, that they were trying to move her to Canada? The reason, Judge, I'm saying that, it doesn't matter why she… She was looking for a job in May. She was hired for a position in August while she was still employed, according to ABRAM, on August 3rd. So, I think that argument is disingenuous to say that suddenly she was trying to bamboozle them in some way. Okay. Now, Judge, I'll have the question, and then you're going to finish up with one or two concise sentences. So, when your client said, claimed current employment, is your point that that was literally true every time that statement was made? It would never lie? According to ABRAM, her last day of employment was August 3rd. Her final interview was on August 3rd. So, if you believe ABRAM that her last day of employment was August 3rd, then absolutely. But that's the fact dispute that you want to send back. Got it. Well, actually, I'm out of time. I think our argument has been made clear. Thank you for your time. Okay. Thank you, counsel, and I appreciate your patience with the court and with each other so that we could get the questions answered and give everybody a fair opportunity to be heard today. Thank you so much, and this case is submitted, and the court will stand in recess until tomorrow morning. Thank you.